REL: 09/19/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1130573

_____

**Ex parte S.L.M. and R.S.M.**

**PETITION FOR WRIT OF CERTIORARI
TO THE COURT OF CIVIL APPEALS**

(In re: S.L.M. and R.S.M.

v.

S.C.)

(Etowah Juvenile Court, JU-11-120.02 and JU-11-487.02;
Court of Civil Appeals, 2120004)

STUART, Justice.

1130573

This Court issued a writ of certiorari to determine, among other issues, whether the decision of the Court of Civil Appeals on return to remand, determining that sufficient evidence was presented to support the juvenile court's decision to modify custody, conflicts with Ex parte McLendon, 455 So. 2d 863 (Ala. 1984).[1]  We reverse the judgment of the Court of Civil Appeals and render a judgment for S.L.M. and R.S.M.

## Facts

S.C., the maternal grandmother, petitioned the Etowah Juvenile Court to intervene and to grant her custody of S.D.A., who was 19 months old at the time of trial, and R.D.A., who was 9 months old at the time of trial, both of whom were in the custody of S.L.M. and R.S.M. (S.D.A. and

---

[1]This case presents a procedural quagmire and involves questionable decisions by both the juvenile court and the Court of Civil Appeals.  Given the posture of this case and the importance of minimizing disruption in custody and promoting stability of custody in this case, this Court addresses this determinative substantive issue and pretermits the consideration of other issues.  Our refusal to address the other issues, however, should not be understood as an approval of all the language, reasons, or statements of law in the Court of Civil Appeals' opinions relating to those other issues or in the juvenile court's orders. Cf. Horsley v. Horsley, 291 Ala. 782, 280 So. 2d 155 (1973).

2

1130573

R.D.A. are hereinafter referred to collectively as "the children").[2] S.L.M. and R.S.M. are not related to the children. In the petitions, the grandmother alleged that the children were dependent as to the mother and the biological father, that S.L.M. may have been awarded temporary custody of the children, and that it would be in the best interest of the children for the children to be placed in her custody.

At trial, the maternal grandmother testified that she lived in Kentucky, that she and the children's mother were estranged, that she had custody of the mother's oldest child, and that she had been unaware of the births of the children. She explained that, when she learned about the children, she contacted the Department of Human Resources, requesting information about and custody of the children. She testified that she was physically and financially able to take care of all three children and that she wanted them to grow up as a family. The maternal grandmother admitted that she had never met the children and that the oldest child had only seen photographs of the children.

---

[2]Specifically, S.L.M. had been awarded "temporary legal custody" of S.D.A., and S.L.M. and R.S.M. had been awarded custody of R.D.A.

3

1130573

S.L.M. testified that, although she was not a blood relative of the mother, she had known the mother for over 20 years and considered the mother a "sister." She explained:

> "We are -- I love [the mother] like a sister, and she loves me. I have been the only person there for [the mother]. [The mother] is a struggling drug addict that needs help, and I have been the only one there. But no, we are not related."

With regard to her relationship with the children, S.L.M. testified that the children had lived with her and her husband, R.S.M., since their respective births. She explained that she brought each child to her home from the hospital because of the mother's drug-addiction problems. S.L.M. testified:

> "I love them like they are my own. I have cared for the children since day one. I stayed in the Birmingham hospital with [the youngest child] for five weeks because she was born premature in a motel room and almost died. None of [the mother's] family ... could even call me and ask if that baby was alive or dead. I was the only one there for that baby, the only one. I have had the babies since day one. I have been the only one there for them, and I love them. I love them like they are my own."

She stated that R.S.M. is a good father and that their daughter loves the children. When asked how often the mother visits with the children, S.L.M. replied, "sometimes a week, sometime a couple of weeks. It just depends on how [the

4

mother] is to tell you the truth." She stated that she allowed the mother to visit with the children if the mother was "straight."

R.S.M. testified that he shares custody of the children with S.L.M., his wife of 13 years. He stated that he loved the children like his own daughter and that he willingly provided for them, carried them to doctor's appointments, and used his income to support them.

The mother testified that she wanted S.L.M. to have custody of her children. She elaborated about the children's lives with S.L.M., stating:

> "[W]hen I went to church with the kids -- they are going to church. They are living a very Christian life. The kids are done very fairly. I mean, they have got all the toys in the world you can dream of. I mean, they are spoiled. I mean, I will give you that. They are spoiled. And they are really over loved. They are. I mean, there is so much love around them."

The mother admitted that the maternal grandmother could provide adequately for the children but maintained that she wanted the children to remain with S.L.M. and R.S.M. so that she could continue to have a relationship with the children.

The following testimony was developed with regard to the mother's visitation and relationship with the children:

5

1130573

"[THE COURT]: How often do you see the two children here?

"[The mother]: Well, up until I had left[3] I was getting to see them once a week to once every two weeks, depending upon their schedule.

"[THE COURT]:  How often would you see them when you would see them?

"[The mother]: A couple of hours a day.  The longest -- what was it, nine hours I got? And then I spent the night, spent the night on several occasions. And then the girls, they spent the night with me.

"Remember, you came over to the motel and you stayed the night with me when [my boyfriend] was at work.

"[S.L.M.]: We stayed until late but we never stayed all night.

"[The mother]: I'm sorry.  That's my mistake.

"....

"[THE COURT]: Tell me more about the night that you -- the children were there late at the motel.  Where was that at?

"[The mother]: That's when I was  -- that's when I was over there at Super 8 [motel].

"[THE COURT]: How long has that been?

"[The mother]: It ain't been long.  Probably weeks.

"[THE COURT]: Recently?

---

[3]The mother moved to Arizona to find temporary employment.

6

1130573

"[The mother]: Yeah, recently.

"[THE COURT]: And that's the time you were doing drugs from what you testified a while ago. Were you not on drugs?

"[The mother]: I had one relapse about two months ago. It may have been three. I'm guessing two. I'm having to guess here.

"[THE COURT]: You were saying it was two months ago that this happened. So this was the time --

"[S.L.M.]: It was before her relapse. Like a week later I called her to tell her we were going to come back over and let her see the kids, and she told me she relapsed, and I didn't go back.

"[The mother]: Anytime I have relapsed I have been honest with her. Anytime I have relapsed I have been honest with her.

"....

"[THE COURT]: If I decided that I don't want you around the kids based on the fact of your drug usage and entered an order that [S.L.M.] could not let you see the children, what would that do to you and placement? Would that affect it? I'm really concerned about you being around the kids with drug use. I'm just curious. Would that change in your mind -- is the fact that [S.L.M.] gives you access to the children --

"[The mother]: She doesn't let me be around them when I'm using, no. I have always been honest with her. I know she is probably mad at me right now knowing that I have. But I have always been honest with her.

"....

7

1130573

"[THE COURT]: Has [the mother] ever been with the children alone since you have had them?

"[S.L.M.]: Never, ever.

"[THE COURT]: So a while ago when she testified she had them one night by herself in a motel, that never happened?

"[S.L.M.]: No sir.  That was the night I was there. We stayed until about 11:00 o'clock that night.  We took her out to eat at Pizza Hut.  He dropped us off, and he come back at 11:00 o'clock at night to pick us up.  She has never been one minute by herself with those children ever, never."

In closing, the maternal grandmother's counsel argued that the children should be placed with a relative and that, because the children's half sister was in the custody of the maternal grandmother, the children should be placed in the custody of the maternal grandmother and be united with their half sister.

After considering the evidence, the juvenile court entered orders awarding custody of the children to the maternal grandmother.  After S.L.M. and R.S.M.'s posttrial motions were denied, they appealed the judgment to the Court of Civil Appeals.

The Court of Civil Appeals, after reviewing the record, remanded the cases to the juvenile court to make written

8

1130573

findings of fact to support its judgments. <u>S.L.M. v. S.C.,</u>
[Ms. 2120004, April 12, 2013] ___ So. 3d ___, ___ (Ala. Civ.
App. 2013). On remand, the juvenile court entered identical
orders as to each child explaining the reasons for its
decision to modify custody with regard to each child, stating:

"3. This Court heard evidence at [a] hearing
addressing [the maternal grandmother's] petition for
custody. The evidence heard included all events
from the birth of both children to present. The
[maternal grandmother] provided testimony that she
is a fit and proper person to have the care, custody
and control of her granddaughter. She also has
custody of the minor child's older half sibling.

"4. At the hearing, the mother of the minor
child testified that the present custodians let her
have overnight visits with the minor child. The
mother also testified that she was still using drugs
and still had a problem with them. She also
testified that she did not want her mother to have
custody of the minor child because she would hold
her accountable for using drugs and restrict her
visits with the minor child if the mother was using
drugs, but the present custodian understood her drug
use even though it would make her mad. The Court
was greatly disturbed by this, and concerned that
the minor child was being exposed to the situation
which removed her from her natural mother in the
first place. It was clear and convincing evidence
from the testimony of all the parties, that the
[maternal grandmother] limits the contact between
the mother and the older half sibling but that the
present custodians of the minor child [do] not.

"....

9

1130573

> "Based on the evidence, the Court finds that there has been a material change in circumstances in this case and that the positive good brought about by the modification would more than offset the inherently disruptive effect caused by uprooting the child. The child is young and the court finds that the young child will adapt to the circumstances. She would be living with a loving grandmother, with her other siblings.
>
> "This Court finds that the positive good brought by the change of custody would offset any disruption that might be caused. By granting custody of the child to the [maternal grandmother], all of the children would be together, and be protected from their mother who admitted to still using drugs."

On return to remand, the Court of Civil Appeals affirmed the juvenile court's judgments. S.L.M. v. S.C., [Ms. 2120004, October 4, 2013] ___ So. 3d ___ (Ala. Civ. App. 2013)(opinion on return to remand).

## Standard of Review

> "'On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals.'"

Ex parte Helms, 873 So. 2d 1139, 1143 (Ala. 2003)(quoting Ex parte Toyota Motor Corp., 684 So. 2d 132, 135 (Ala. 1996)).

## Discussion

S.L.M. and R.S.M. contend that the Court of Civil Appeals erred in affirming the juvenile court's judgments holding

10

that the maternal grandmother presented sufficient evidence to modify custody of the children.

After a juvenile court has placed a dependent child into the custody of a proper caregiver, consideration of a change of custody is conducted pursuant to the standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984). See Ex parte J.P., 641 So. 2d 276, 278 (Ala. 1994)(applying the McLendon standard in a custody dispute between two sets of relatives when one set of relatives had been awarded custody under a prior judicial order). In Ex parte Cleghorn, 993 So. 2d 462, 466-68 (Ala. 2008), this Court stated:

> "In Ex parte McLendon, we held that the trial court cannot order a change of custody '"unless [the party seeking the change of custody] can show that a change of the custody will materially promote [the] child's welfare."' 455 So. 2d at 865 (quoting Greene v. Greene, 249 Ala. 155, 157, 30 So. 2d 444, 445 (1947)). We noted in Ex parte McLendon that '[i]t is important that [the party seeking the change in custody] show that the child's interests are promoted by the change, i.e., that [the party seeking the change in custody] produce evidence to overcome the "inherently disruptive effect caused by uprooting the child."' 455 So. 2d at 866. ...
>
> "....
>
> "Our decision in Ex parte McLendon provides that a party seeking a change in custody must show that the change 'will materially promote [the] child's welfare.' 455 So. 2d at 865. The McLendon standard

11

1130573

is a 'rule of repose,' meant to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption. Ex parte McLendon, 455 So. 2d at 865. It is founded on the longstanding principle that '[i]t is the court's duty to scrupulously guard and protect the interests of children. And in the context of child-custody proceedings, the dominant consideration is always the best interest of the child.' Ex parte Fann, 810 So. 2d 631, 638 (Ala. 2001). See also McCartney v. McCartney, 11 So. 3d 213, 220-21 (Ala. Civ. App. 2007)('"The controlling consideration in child-custody matters is always the best interests of the child."' (quoting Patrick v. Williams, 952 So. 2d 1131, 1140 (Ala. Civ. App. 2006)))."

Here, the evidence is not sufficient to satisfy the McLendon standard, and it does not support a finding that the children's best interest would be served by modifying custody and removing the children from S.L.M. and R.S.M.'s home. The children have lived in the Gadsden area and have been with S.L.M and R.S.M. since their births. R.D.A. was born premature and struggled to survive. S.L.M. cared for her throughout her five-week hospitalization and has continued, along with R.S.M., to tend to her medical needs. The evidence indicates that the children's physical and financial needs are met and that they are well loved. The maternal grandmother testified that she wanted custody of the children because they were blood relatives and because she wanted to unite them with

12

their half sister. The maternal grandmother, however, admitted that she had never seen the children and that, although the older half sister of the children had seen photographs of the children, she also had never met them. The evidence simply does not support a finding that the benefits of relocating the children with the maternal grandmother would materially promote the best interest of the children and more than offset the disruptive effect of a change of custody. Instead, the record supports the need to "preserve the stability of these young children by keeping them in an indisputably suitable home with two undeniably commendable and caring custodians instead of uprooting them to live with complete strangers, although ones related by blood, in an unknown environment." S.L.M. v. S.C., [Ms. 2120004, Feb. 14, 2014] ___ So. 3d ___, ___ (Ala. Civ. App. 2013)(order overruling application for rehearing)(Moore, J., dissenting)(footnote omitted).

This Court is mindful of the juvenile court's concern that the children in S.L.M. and R.S.M.'s custody may be exposed to the situation that caused them to be removed from the mother in the first place. However, the evidence was not

13

1130573

clear and convincing that the children had indeed been exposed to the mother's drug use; rather, the testimony established clearly and convincingly that, although S.L.M. "understands" the mother's drug use, she does not allow the children to be around the mother when the mother is using drugs.

> "'A custody determination of the [juvenile] court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 SO. 2d 440 (Ala. Civ. App. 1989), and Vail v. Vail, 532 So. 2d 639 (Ala. Civ. App. 1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong.'"

Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994)(quoting Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993)). Here, the evidence does not support a modification of custody. Nothing in the record supports the conclusion that modifying custody and removing the children from the home of S.L.M. and R.S.M. would materially promote the children's best interest; therefore, granting the maternal grandmother custody of the children is plainly and palpably wrong.

## Conclusion

Based on the foregoing, the judgment of the Court of Civil Appeals affirming the juvenile court's erroneous

14

1130573

judgment is reversed, and a judgment is rendered for S.L.M. and R.S.M.

REVERSED AND JUDGMENT RENDERED.

Bolin, Parker, Shaw, Main, Wise, and Bryan, JJ., concur.

Murdock, J., concurs in the result.

Moore, C.J., dissents.