Rel: August 22, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

### CL-2025-0032

_____

### B.F.

### v.

### C.D. and A.D.

### Appeal from Coffee Juvenile Court
### (JU-21-122.02)

PER CURIAM.

B.F. ("the father") appeals from a judgment of the Coffee Juvenile Court ("the juvenile court") denying his petition insofar as it sought custody of S.G.R. ("the child"). We reverse the juvenile court's judgment and remand the case.

<u>Background</u>

The juvenile court entered its judgment on January 5, 2025, following a trial on December 3, 2024. Its judgment summarized the procedural history of the litigation involving the child, made findings of fact, and stated the juvenile court's conclusion of law. In pertinent part, the judgment stated:

> "The court taking judicial notice of its previous order in 19-JU-2021-122.01 determined that the child was adjudged to be dependent by order of the court dated October 4, 2021, and that physical and legal custody of the … child was vested with the respondent [C.D.] (and her husband [A.D.]) by that same order. The order of October 4, 2021, set forth that the father of the child was unknown.
>
> "Testimony and evidence were presented ore tenus regarding the [father's petition for custody of the child, which the juvenile court treated as a petition to modify the child's custody] and the request to change the current custody order and upon consideration of the testimony and evidence presented the court determined that any relief requested by the [father] with respect to the request to change the current custody of the minor child was due to be denied. The [father] failed to meet the custody-modification standard set forth in <u>Ex parte McLendon</u>, 455 So. 2d 863 (Ala. 1984), as the court determined that no material change in circumstances has occurred since the last custody order and that there was insufficient evidence to support a conclusion that a change in custody would materially promote the best interest and welfare of the child so that the positive good brought about by the modification would more than offset the inherently disruptive effect of the change in custody.

2

"The child was born [i]n April … 2021, and in June 2021 as part of a safety plan initiated by the [Coffee County] Department of Human Resources, the child was placed in the home of [C.D.]. At the time of the child's birth there was no legal or presumed father; however, evidence at this hearing was that [the father] knew that the [mother] was pregnant, that they had been engaged in a sexual relationship, [that] he was sent pictures of the child after birth, [that he] met and saw the baby when he was a couple of days old, and [that he] bought formula for the baby after he was born. In addition, the child's mother sent pictures and messages to [the father's] mother [C.F.] of the baby after he was born, commenting that 'the baby looks like [the father].' The court finds this significant in that [C.F.] has worked for 25+ years with Embrace Kids, which is in some regard affiliated with the [Coffee County] Department of Human Resources in working ... to reunify children with families and provide services to families in need. Less than six months after the child's birth a dependency petition was filed by the [Coffee County] Department of Human Resources and at the shelter[-]care hearing on October 4, 2021, the child was adjudged to be dependent, and custody vested with [C.D. and A.D.] [C.D.] is a lifelong friend to the child's mother and also has custody of two of the mother's daughters who are half-siblings to this child. The half-siblings have been in the care and custody of [C.D.] and her husband since 2019. The child has remained in the exclusive care of [C.D.] since the adjudication of dependency and disposition and all of the child's needs are being met by [C.D. and A.D.]

"This most instant petition was filed on behalf of [the father] on February 15, 2024, nearly three years after the birth of the child. On June 4, 2024, the issue of paternity was addressed by the court and as result of DNA genetic testing, and with no objection from the parties, [the father] was adjudged to be the father of the child. Despite the arguments and assertions of counsel prior to the final hearing the court determined that the appropriate standard to be applied in this

matter was the McLendon standard. Counsel for the [father] argues that the appropriate standard would be the Terry standard (Ex Parte Terry, 494 So. 2d 628 (Ala. 1986)), relying on R.O.M. v. B.B., 854 So. 2d 98 (Ala. Civ. App. 2003). This court in determining that the McLendon standard was appropriate relied first on the custody order in 19-JU-2021-122.01 which determined that the child was dependent and that physical and legal custody of the … child was vested with the respondent [C.D.] (and her husband [A.D.]). In Ex parte McLendon the Alabama Supreme Court followed the case of Ex parte Mathews, 428 So. 2d 58 (Ala. 1983), in determining that 'a natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a non-parent.' In this instant matter there is a clear prior [order], the order in JU-2021-122.01 dated October 4, 2021. Although at the time of that order the father of the child was unknown and [the father] was not noticed of that proceeding, this court is satisfied that the child's father … had more than enough notice, information, and belief that he was the biological father of the child and failed to avail himself of the rights of a father and that through his own actions voluntarily forfeited any right to custody of the child. The father admitted that he has had a long history of substance abuse/misuse [and t]hat around the time of the pregnancy and birth of the child … he and the child's mother engaged in the use of illegal controlled substances. It should be noted that the child was born positive for methamphetamine[], the drug of choice for the mother and [the] father. The child was born [i]n April … 2021, and in June 2021 the father was arrested and incarcerated for the offense of possession or receipt of a controlled substance while he was on probation for the same type of offense. The father remained continuously incarcerated from June 2021 until he was sentenced to prison in December 2021. The father remained imprisoned until his release in July 2022 whe[n] he was sent to a substance abuse rehabilitation program for eighteen (18) months and was

4

subsequently discharged from that program in December 2023. On February 15, 2024, the child's father filed this petition. For the majority of the child's life from birth until the filing of this petition the father was either in jail, prison, or rehab, abandoning this child to the care of others. This court is convinced that the father had more than enough notice and information that he was the father of the child, or at a minimum enough information to act on that belief over the course of the past three years prior to the filing of this petition in February 2024. During that entire three-year period of time the child has resided exclusively in the home of [C.D. and A.D.] It was ... the father's voluntary choice to engage in the use of illegal controlled substances to the point that it led to his incarceration and imprisonment to his own detriment, but all the while abandoning the needs of this child to the care of [C.D. and A.D.] It is noteworthy that the father seems to have addressed his substance-abuse past by remaining sober at present; however, the court is convinced that the child's father knew of the existence of the child at the time he was making these decisions and voluntarily forfeited any right to the custody of the child by engaging in these illicit behaviors. As previously mentioned, the father knew that the mother was pregnant, that they had been engaged in a sexual relationship, [that] pictures of the child [reflected that the child] looked like him as a baby, [that] he met and saw the baby when he was a couple of days old, and [that] he provided financial support for the benefit of the child, all prior to his incarceration and imprisonment. [The father's] mother [C.F.] has made a career of working with families and possessed the inherent knowledge that comes with her profession to advise her son, and [the father] had the resources available to him to avail himself of any parental authority over the child; however, he failed to do so by his own volition. [The father] did not want to be a father to this child when this child was born and did not want to be a father to this child for the first three years of the child's life. Only now that he represents that he has 'changed' and 'cleaned himself up' does he want to assume the role of a parent. All the while, every need this

child has had from the time he was placed in the home of [C.D.] have been met by [C.D.] and her husband. The child refers to [A.D. and C.D.] as 'daddy' and 'momma' and [C.D. and A.D.] are the only mother and father this child has ever known. The child is now three years old and has resided his entire life in the home of [C.D. and A.D.] along with his two half-sibling sisters. Such a significant emotional tie exists given the length of time the child has been in the home of [C.D. and A.D.] and severing that tie would not serve the best interests of the child. [C.D. and A.D.'s] home is fit and acceptable and they have all they need to properly care for the child and meet all of the child's needs.

"The child's mother [M.R.] admits that she is not in a position to care for the child, that she admittedly voluntarily relinquished custody of the child at the time of the dependency order in October 2021, and that she was in agreement that the child should reside with [C.D.]

"The court determined that the father, [B.F.], is exercising some visitation with the child and the parties agree that additional visits between the father and the child would be made available by [C.D.] The parties are in agreement, and the Court is of the opinion that it would serve the best interest of the child to develop a relationship with his biological father, whom the child does not know, and that the father should be awarded visitation with the child; however, a change in custody would not materially promote the best interest and welfare of the child so that the positive good brought about by the modification would more than offset the inherently disruptive effect of the change in custody.

"IT IS THEREFORE ORDERED as follows that the 'petition for custody,' more properly, the request to change the current custody order is hereby DENIED and DISMISSED. However, the [father] shall have visitation at such times and places as the father and custodians may mutually agree upon. In the absence of an agreement the father shall have visits

6

with the child as set forth by the Visitation Schedule below which is incorporated by reference as the Order of the Court.

"Any other relief requested not specifically addressed herein is deemed to be denied."

(Capitalization in original.)

Following the entry of the juvenile court's judgment, the father timely appealed.

Standard of Review

"When evidence in a child custody case has been presented ore tenus to the [juvenile] court, that court's findings of fact based on that evidence are presumed to be correct." Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996). As our supreme court explained in Bryowsky, "[t]he trial court is in the best position to make a custody determination -- it hears the evidence and observes the witnesses." Id. An appellate court is not permitted to reweigh the evidence or to substitute its judgment for that of the trial court. See Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993). On the other hand, the ore tenus presumption of correctness does not apply to a juvenile court's conclusions regarding questions of law, and an appellate court reviews

7

those conclusions de novo. See <u>R.K. v. R.J.</u>, 843 So. 2d 774, 776 (Ala. Civ. App. 2002).

Analysis

The father's sole argument on appeal is that the juvenile court erred by applying the custody-modification standard set forth in <u>Ex parte McLendon</u>, 455 So. 2d 863, 865 (Ala. 1984), in determining whether to modify the child's custody instead of applying the parental-custody presumption and the best-interest standard pursuant to <u>Ex parte Terry</u>, 494 So. 2d 628, 632 (Ala. 1986). We agree.

In <u>Terry</u>, our supreme court, quoting <u>Ex parte Mathews</u>, 428 So. 2d 58, 59 (Ala. 1983), held:

> " 'The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. <u>So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.</u>' "

494 So. 2d at 632. There are exceptions to <u>Terry</u>'s parental presumption. "Specifically, the parental 'presumption does not apply after [1] a

8

voluntary forfeiture of custody or [2] a prior decree removing custody from the natural parent and awarding it to a nonparent.'" Ex parte D.J., 645 So. 2d 303, 306 (Ala. 1994) (quoting McLendon, 455 So. 2d at 865). If one of those circumstances is proven, the Terry standard is replaced by the McLendon standard, under which a parent will not be permitted to reclaim custody of his or her child unless the parent demonstrates that a change in the child's custody will materially promote the child's welfare and that the positive good brought about by the change will more than offset the inherently disruptive effect caused by uprooting the child. See McLendon, 455 So. 2d at 865.

Citing D.J., the father argues that neither of the circumstances constituting exceptions to the application of the Terry standard exist in this case. Specifically, he argues that he could not have voluntarily forfeited his right to custody of the child because, he says, D.J. holds that there can be no such forfeiture before he gained a right to custody upon the juvenile court's adjudicating him the child's legal father on June 7, 2024, after he had already begun actively prosecuting this action seeking custody of the child. Moreover, he argues that there could be no previous judgment removing custody of the child from him because, he says, he

9

had neither actual custody of the child nor a right to custody of the child when the juvenile court entered the judgment finding the child dependent and transferring custody to C.D. and A.D. in 2021.

In D.J., B.W.J. was born in 1983 to V.J. and W.B.Z., who never married. 645 So. 2d at 304. From the date of his birth until V.J. died on April 27, 1991, B.W.J. lived with V.J., who intermittently lived with D.J., B.W.J.'s maternal grandmother. Id. After V.J.'s death but before July 19, 1991, the date D.J. petitioned the Mobile Juvenile Court for custody of B.W.J., W.B.Z. petitioned the Mobile Probate Court to legitimate B.W.J. The probate court granted W.B.Z.'s petition to legitimate B.W.J. on September 5, 1991. Id. On November 18, 1991, the Mobile Juvenile Court held a hearing regarding D.J.'s custody petition. Id. Thereafter, the Mobile Juvenile Court awarded D.J. custody but awarded W.B.Z. visitation. Id. The Mobile Juvenile Court also scheduled a second hearing to review "'whether or not the child [had so] progressed in his relationship with [W.B.Z.] ... that it would be appropriate for the child to be placed in the home of [W.B.Z.].'" Id. at 304-05. Following that second hearing, the Mobile Juvenile Court entered an order stating, among other things, that W.B.Z. and his wife were "able and anxious to provide for the

child" but further stating "'that it is in the best interest of [B.W.J.] that custody remain with [D.J.] ... and that a <u>change in custody to [W.B.Z.]</u> <u>would not materially promote the child's welfare so as to overcome the</u> <u>inherently disruptive effect caused by uprooting the child</u>.'" <u>Id.</u> at 305. In effect, the Mobile Juvenile Court applied the <u>McLendon</u> standard rather than the <u>Terry</u> standard in resolving whether W.B.Z. should have custody of his child.

W.B.Z. appealed to this court, which reversed the Mobile Juvenile Court's judgment, holding that the Mobile Juvenile Court had erred because it did not afford W.B.Z. the benefit of a parental presumption, i.e., a presumption that the interests of B.W.J. would best be served by placing the child in his custody absent a finding that he was unfit. <u>Id.</u> D.J. then petitioned our supreme court for a writ of certiorari, which that court granted. <u>Id.</u>

Our supreme court held that, in a custody contest between a nonparent and one who has been adjudicated to be the natural father of a child born out of wedlock, the father is entitled to the presumption that the child's interests will best be served by an award of custody to him, subject to the absence of a finding that he is unfit and subject to the

11

exceptions that apply when the father has voluntary forfeited custody or when a prior custody judgment removing custody from the father and awarding it to a nonparent exists. Id. at 306-08. Our supreme court further held that, when those exceptions apply, the unwed father would not be permitted to reclaim the custody of the child unless he can show that a change of custody will materially promote his child's welfare. Id.

Our supreme court noted that the Mobile Juvenile Court had applied the standard required when those exceptions to the parental presumption apply and examined whether those exceptions existed in that case. Id. Regarding the issue whether W.B.Z. had voluntarily forfeited his right to custody, our supreme court wrote:

> "Guided by [the] rule [that mothers of children born out of wedlock have a superior right to custody of those children], we conclude that W.B.Z., a putative father who, before V.J.'s death never possessed legal or physical custody of his unlegitimated child, acquired no custody rights that could have been relinquished to V.J. Custody vested exclusively in V.J. at the birth of her child and remained there until she died on April 27, 1991. W.B.Z. did not, therefore, relinquish any custody rights before V.J.'s death, because -- vis-à-vis V.J., at least -- he possessed none. Moreover, his promptness in initiating legitimation proceedings and in seeking custody after her death conclusively rebuts any contention that he relinquished custody rights thereafter. Thus, we conclude that the 'relinquishment' exception to the parental presumption provided no basis for the standard applied by the trial court in this case."

12

Id. at 307 (footnote omitted).

With respect to the prior-custody-judgment exception, our supreme court held that "because W.B.Z. had not acquired custody before November 18, 1991, it can hardly be contended that the order on that date 'removed' or transferred custody from him. Therefore, we conclude that the 'prior[-] decree' exception to the parental presumption provided no basis for the standard applied by the trial court in this case." Id. at 308. Thus, the supreme court affirmed this court's reversal of the trial court's judgment, holding that the trial court had improperly failed to apply the Terry standard in resolving W.B.Z.'s claim to custody of his child.

In 2005, in Ex parte G.C., 924 So. 2d 651, 657 (Ala. 2005), our supreme court interpreted its holding in D.J., writing:

> "In Ex parte D.J., 645 So. 2d 303 (Ala. 1994), this Court determined that an examination of whether a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child."

13

(Emphasis added.)[1] Additionally, in R.K. v. R.J., 843 So. 2d 774, 782 (Ala. Civ. App. 2002), this court interpreted the relevant holding of D.J. in a similar manner, writing:

> "The State may decide, insofar as state law is concerned, that the physical abandonment of a child by an unwed, biological father (in contrast to such father's abandonment of adjudicated paternity rights), should not prevent such a father from being on an equal presumptive footing with a fit, custodial mother -- and on better footing than all other parties, regardless of their historical relationships with the children -- if and when such a father's paternity is eventually adjudicated. Indeed, Ex parte D.J. appears to do that."

(Emphasis added.) See also R.O.M. v. B.B., 854 So. 2d 98, 105 (Ala. Civ. App. 2003) (Murdock, J., concurring) ("Ex parte D.J. stands for the proposition that if the issue in a custody case is whether a parent has voluntarily relinquished that custody, a trial court may not consider evidence of the parent's actual physical or psychological abandonment of

---

[1]Although, on its face, the main opinion in G.C. appears to be a plurality opinion, with only four justices concurring or concurring specially in it, at least one more justice who wrote separately appeared to concur with the main opinion's explanation of the holding in D.J. that the relevant period to examine whether a father has relinquished his right to custody of his child does not begin until the child has been legitimated. G.C., 924 So. 2d at 669 (See, J., concurring in part and dissenting in part).

14

the child that occurs before the parent is legally declared by a court to be the parent.").

Based on our supreme court's holding in D.J. and its later interpretation of that holding in G.C., because he had not been adjudicated the legal father of the child until June 4, 2024, the father could not have voluntarily forfeited his right to custody of the child before June 4, 2024, and his prosecution of the present action, which he initiated several months earlier, establishes that he had not voluntarily forfeited his right to custody after June 7, 2024. Moreover, under D.J., because he had not been adjudicated the legal father of the child before June 7, 2024, and, thus, had no right to custody of the child before June 7, 2024, the 2021 dependency judgment transferring custody of the child to C.D. and A.D. could not be considered a prior judgment removing the child from his custody. D.J., 645 So. 2d at 308. Consequently, neither of the exceptions to the Terry presumption that the child's interests will best be served by an award of custody to the father apply in this case.

Accordingly, based on our supreme court's holding in D.J. and its later interpretation of that holding in G.C., we conclude that the juvenile court was required to consider the father's claim for custody of the child

under the <u>Terry</u> standard rather than under the <u>McLendon</u> standard. Specifically, the juvenile court was required to presume that awarding custody of the child to the father was in the child's best interest unless it concluded that the father was unfit. The juvenile court having applied the wrong standard, we must reverse the judgment and remand the cause to the juvenile court with instructions to reconsider the father's petition under the correct standard.

## Conclusion

Because the juvenile court erred in applying the <u>McLendon</u> standard instead of the <u>Terry</u> standard in resolving the father's claim to custody of the child, we reverse the juvenile court's judgment and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., concurs specially, with opinion, which Edwards, Hanson, Fridy, and Bowden, JJ., join.

MOORE, Presiding Judge, concurring specially.

I reluctantly concur in the reversal of the judgment entered by the Coffee Juvenile Court ("the juvenile court") because this court is bound by the decisions of the Alabama Supreme Court. See Ala. Code 1975, § 12-3-16. As the main opinion holds, the supreme court's decisions in Ex parte D.J., 645 So. 2d 303 (Ala. 1994), and Ex parte G.C., 924 So. 2d 651 (Ala. 2005), control the outcome of this case. I write specially to express my disagreement with those decisions and to urge the supreme court to overrule them.

In Ex parte D.J., V.J., the mother, and W.B.Z., the putative father, had never married, but they conceived a child together, B.W.J., who was born in 1983. V.J. and B.W.J. intermittently resided with D.J., the child's maternal grandmother. In 1991, V.J. unexpectedly died. W.B.Z. subsequently commenced legitimation proceedings regarding B.W.J., and D.J. filed a petition to obtain custody of B.W.J. in the Mobile Juvenile Court, which awarded her pendente lite custody. Upon a final hearing, the Mobile Juvenile Court awarded D.J. custody of B.W.J. On appeal, this court reversed the judgment, holding that the Mobile Juvenile Court had erred in failing to apply the parental presumption in favor of W.B.Z.

17

See W.B.Z. v. D.J., 645 So. 2d 300 (Ala. Civ. App. 1993). Upon a petition for the writ of certiorari, the supreme court affirmed our decision.

In Ex parte Terry, 494 So. 2d 628 (Ala. 1986), our supreme court held that, in a child-custody dispute between a parent and a nonparent, the parent has a presumptive right to the custody of his or her child. In Ex parte D.J., the supreme court determined that the "parental presumption" recognized in Ex parte Terry applies equally to a putative father of a child born out of wedlock because, it said, like any other natural parent, a putative father enjoys a prima facie right to the custody of his child as against a nonparent. The supreme court then explained that the parental presumption "'does not apply after [1] a voluntary forfeiture of custody or [2] a prior decree removing custody from the natural parent and awarding it to a nonparent.'" 645 So. 3d at 306 (quoting Ex parte McLendon, 455 So. 2d 863, 865 (Ala. 1984)). The supreme court decided that neither exception applied to W.B.Z. First, the supreme court held that W.B.Z. could not have voluntarily relinquished custody of B.W.J. to V.J. and D.J. because, the court noted, under the common law, V.J. had a right to exclusive custody of B.W.J. until her death. The supreme court then said:

"Guided by this rule, we conclude that W.B.Z., a putative father who, before V.J.'s death never possessed legal or physical custody of his unlegitimated child, acquired no custody rights that could have been relinquished to V.J. Custody vested exclusively in V.J. at the birth of her child and remained there until she died on April 27, 1991. W.B.Z. did not, therefore, relinquish any custody rights before V.J.'s death, because -- vis-à-vis V.J., at least -- he possessed none. Moreover, his promptness in initiating legitimation proceedings and in seeking custody after her death conclusively rebuts any contention that he relinquished custody rights thereafter. Thus, we conclude that the 'relinquishment' exception to the parental presumption provided no basis for the standard applied by the trial court in this case."

645 So. 2d at 307. Second, the supreme court then held that the prior-judgment exception did not apply because W.B.Z. had never acquired custody of B.W.J. and no final judgment had been entered removing or transferring the custody of B.W.J. from him before the present litigation. 645 So. 2d at 307-08.

In R.K v. R.J., 843 So. 2d 774, 781 (Ala. Civ. App. 2002), this court misconstrued Ex parte D.J. as holding that, until a putative father has been legally adjudicated to be the father of a child born out of wedlock, he has no custodial rights to forfeit. This court held that, in determining whether a voluntary forfeiture has occurred, a trial court can consider only the conduct of a putative father after his paternity has been

19

judicially established. In <u>R.O.M. v. B.B.</u>, 854 So. 2d 98 (Ala. Civ. App. 2003), Judge Murdock stated in a special writing concurring in the result that

> "<u>Ex parte D.J.</u> stands for the proposition that if the issue in a custody case is whether a parent has voluntarily relinquished that custody, a trial court may not consider evidence of the parent's actual physical or psychological abandonment of the child that occurs before the parent is legally declared by a court to be the parent."

854 So. 2d at 105 (Murdock, J., concurring in the result). Actually, <u>Ex parte D.J.</u> did not hold that voluntary relinquishment by a putative father may occur only after his paternity has been judicially established; instead, the supreme court held that W.B.Z. had acquired custody rights to B.W.J. once V.J. lost custody of B.W.J. due to her death, and the supreme court examined the actions of W.B.Z. following that loss of custody, not just his actions after he had legitimated B.W.J., in deciding whether he had voluntarily relinquished his custody rights. <u>See</u> <u>Ex parte G.C.</u>, 924 So. 2d at 684 n.23 (Parker, J., dissenting) (explaining the substance of the holding of <u>Ex parte D.J.</u>). Thus, <u>Ex parte D.J.</u> holds that a trial court should consider the conduct of a putative father following the mother's loss of the custody of her child because that is when he gains a superior right to custody of the child.

Nevertheless, in Ex parte G.C., Justice Stuart, writing for the court, adopted this court's misinterpretation of Ex parte D.J., stating:

> "In Ex parte D.J., 645 So. 2d 303 (Ala. 1994), this Court determined that an examination of whether a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child. See also R.K. v. R.J., 843 So. 2d 774 (Ala. Civ. App. 2002); and R.O.M. v. B.B., 854 So. 2d 98, 105 (Ala. Civ. App. 2003) (Murdock, J., concurring specially)."

924 So. 2d at 657. Thus, in determining whether G.C., Jr., the putative father in that case, had voluntarily forfeited his custodial rights to J.G.C., his child born out of wedlock, the supreme court considered only the conduct of G.C., Jr., after August 2000, when he was legally declared to be the father of J.G.C. Id. A close reading of the several special writings in Ex parte G.C. shows that a majority of the court -- Chief Justice Nabers and Justices Smith, Bolin, See, and Lyons -- concurred with the voluntary-forfeiture analysis used by Justice Stuart. So, as the law stands today, when determining whether a putative father has voluntarily relinquished his custodial rights to a child, a trial court may consider only evidence of his conduct occurring after his paternity has been established and must disregard any conduct occurring from the time

21

the child is born to the date of the adjudication of paternity. In my opinion, that statement of the law is clearly erroneous.

In <u>Daniels v. Trawick</u>, 232 Ala. 466, 467, 168 So. 551, 551 (1936), a young couple married, but separated after the wife gave birth to a child. A few weeks after the child was born, the wife and the child moved in with the child's maternal grandparents, while the husband resided separately on his family's farm. When the child was still an infant, the wife suffered a fatal illness, and, as a dying request, she indicated that she wanted the maternal grandparents to raise the child. A custody dispute arose between the husband, the presumed father of the child, and the maternal grandparents, and the trial court awarded custody of the child to the maternal grandparents. The supreme court affirmed the judgment, saying:

> "The prima facie right is with the father. ... The parent may forfeit this prima facie right by his conduct ..., and there is evidence justifying the conclusion that [the husband] was unkind and inattentive to his wife during her illness and indifferent to the child and its welfare (refusing to provide for it, except upon unjustifiable conditions), while [the maternal grandparents] were caring for them both in their humble home."

232 Ala. at 467, 168 So. at 552. Daniels shows that a natural father may, by his indifferent conduct toward a child and refusal to provide for the child as a father should, forfeit his right to custody of the child.

In Ex parte D.J., when B.W.J. was three years old, W.B.Z. moved to Texas. While residing in Texas, W.B.Z. had only negligible involvement with B.W.J. W.B.Z. did not attempt to legitimate B.W.J. or obtain his custody until after V.J. died. See W.B.Z. v. D.J., 645 So. 2d at 303 (Thigpen, J., concurring in part and dissenting in part). Under the reasoning of Daniels, W.B.Z., by his indifference toward B.W.J. over many years, forfeited his parental presumption; however, in Ex parte D.J., the supreme court did not analyze the case to determine whether W.B.Z. had forfeited his parental presumption; instead, it analyzed the case to determine whether W.B.Z. had "voluntarily relinquished" his custody rights to the child, i.e., whether he had voluntarily and intentionally surrendered a known right. 645 So. 2d at 306. The supreme court reasoned that a putative father cannot relinquish his custody rights to a child born out of wedlock to the mother of that child because, as against the mother, he has no custody rights. The supreme court said: "[A] fortiori, [a putative father] cannot waive or relinquish a right that

does not exist." 645 So. 2d at 307. The supreme court determined that W.B.Z. had received custody rights to the child only upon the death of the mother, and, therefore, it said, he could relinquish those rights only after that point. Accordingly, the supreme court confined its examination of the evidence to the actions of W.B.Z. after the date of the mother's death, which showed that he was enforcing his custody rights, and it disregarded W.B.Z.'s actions during the years when he had acquiesced in V.J.'s and D.J.'s providing almost exclusive care for the child. As a result, W.B.Z., a man who was almost a complete stranger to B.W.J., was determined to be entitled to custody without even a consideration of whether that custody arrangement would serve the best interests of the child.

A comparison with Daniels shows that the holding in Ex parte D.J. bestows upon a putative father a parental presumption even stronger than the one bestowed on a presumed father -- a presumed father must act as a parent toward his child from the time the child is born, or otherwise forfeit his parental presumption, whereas a putative father can fail or refuse to act as a parent toward his child so long as the mother is exercising her superior right to custody, and his misconduct will not

24

affect his right to the parental presumption once the mother dies or otherwise loses custody of the child. In essence, the supreme court held that a putative father cannot forfeit his custodial rights regardless of his misconduct toward the child until the law bestows upon him primary custody rights to the child. The supreme court justified this disparity in treatment solely on the nature of the legal rights of a putative father to a child born out of wedlock.

It appears that the supreme court mischaracterized the nature of the custody rights of a putative father. Formerly, the putative father of a child born out of wedlock had no right to custody of the child, <u>see</u> <u>Matthews v. Hobbs</u>, 51 Ala. 210 (1874), but, in 1917, the supreme court held that a "putative father is entitled to the ... custody [of a child born out of wedlock] as against any person but the mother." <u>Garrett v. Mahaley</u>, 199 Ala. 606, 608, 75 So. 10, 11 (1917). <u>See also</u> <u>Ex parte Shuttleworth</u>, 410 So. 2d 896, 899 (Ala. 1981); <u>Griggs v. Barnes</u>, 262 Ala. 357, 78 So. 2d 910 (1955); and <u>Lewis v. Crowell</u>, 210 Ala. 199, 200, 97 So. 691, 692 (1923). Thus, a putative father has at least secondary custody rights to a child born out of wedlock from the time the child is born. Furthermore, a putative father can acquire the same custody rights as

25

the mother by legitimating the child.  See B.E.B. v. H.M., 822 So. 2d 429, 431 (Ala. Civ. App. 2001) (holding that, upon legitimation of a child born out of wedlock, the putative father and the mother stand on equal footing in a custody dispute).  If a putative father does not legitimate the child, he still has a right to form and engage in a paternal relationship with the child that the mother cannot unilaterally thwart.  See D.W. v. J.W.B., 230 So. 3d 763, 775 (Ala. Civ. App. 2015), rev'd, Ex parte J.W.B., 230 So. 3d 783 (Ala. 2016).  If a putative father avails himself of the unique opportunity presented by his biological connection to a child to fully commit to the rearing of the child, he is entitled to the same rights under federal law as a presumed father.  See Lehr v. Robertson, 463 U.S. 248, 261-62 (1983).  If a putative father does not act as a parent toward the child, the state is not obligated to give special consideration to his interests when deciding the custody of his child.  Id.

In Ex parte D.J., the supreme court excused W.B.Z. from acting as a real father toward the child on the ground that he had no custody rights to the child when, in fact, he did have certain custody rights that he did not seek to enforce while V.J. and D.J. cared for the child, such as the right to visitation, see Bagwell v. Powell, 267 Ala. 19, 22, 99 So. 2d 195,

26

197 (1957), the right to legitimate the child, see Ala. Code 1975, § 26-11-2, and the right to petition for custody of the child. See B.E.B., supra. During V.J.'s lifetime, W.B.Z. not only chose not to enforce his legal rights to assure a relationship with B.W.J., but he also intentionally absented himself from B.W.J. by moving to Texas and engaging in only negligible contact with B.W.J. for over five years. Yet, that abandonment and its undoubted effect on B.W.J. was not even allowed to be considered in deciding who should receive custody of B.W.J. after V.J. died because, theoretically, W.B.Z. had no custody rights to B.W.J. to relinquish before her death.

Our legislature recognizes that a putative father may forfeit his rights to a child born out of wedlock before he has acquired any custody rights vis-a-vis the mother. See Ala. Code 1975, § 26-10C-1(i) ("Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding."); Ala. Code 1975, § 26-10E-9 (stating that a putative father who abandons the mother for four months while knowing she is pregnant

27

is presumed to have impliedly consented to relinquish the unborn child for adoption).  Our supreme court should also recognize that a putative father may forfeit his right to the parental presumption before he has acquired full custody rights to a child.  The fact that the mother is exercising her superior custody rights to a child should not relieve a putative father of discharging his parental responsibilities to and for the child, even if his custody rights are considered secondary in nature.  Ex parte D.J. should be overruled.  See R.K. v. R.J., 843 So. 2d at 780 (noting irreconcilable tension between the holding in Ex parte D.J. and other child-custody cases).  A child born out of wedlock deserves the love, affection, and care of both parents, just as a child born in wedlock, and, if the putative father fails to act as a real parent toward his child from the time the child is born, he should not benefit from any presumption that he is entitled to custody after the mother loses custody of the child.

Likewise, the supreme court should overrule Ex parte G.C.  The custodial rights of a putative father do not arise solely when paternity is judicially established, but, as shown, a putative father has certain limited custodial rights from the time the child is born based strictly on his relationship to the child and any greater inchoate custody rights he may

28

have ripen once the mother loses custody of the child. In cases in which the relationship between the putative father and the child is questioned, a judicial declaration of paternity may be necessary to settle the dispute, but that declaration is not the source of the putative father's rights. A trial court should not be precluded from considering the circumstances existing before paternity is judicially established in deciding whether a putative father should be entitled to the parental presumption. If a putative father knows, or should know, of his paternity of a child born out of wedlock and fails to seize his opportunity to forge a paternal relationship with the child, the trial court should be allowed to determine that he has voluntarily forfeited his presumptive right to custody of the child. See, e.g., K.C. v. D.C., 891 So. 2d 346, 349 (Ala. Civ. App. 2004) (holding that, once the mother of a child born out of wedlock acknowledged that she could not properly rear the child and asked her parents to assume custody of the child, the putative father had a superior right to custody of the child and his failure to act upon it resulted in a voluntary forfeiture of his rights, even though he had never been adjudicated to be the legal father of the child). Nothing in the law supports the rule adopted in Ex parte G.C.

In this case, the juvenile court determined that the parental presumption did not apply primarily because B.F. ("the father") had voluntarily forfeited his custodial rights to S.G.R. ("the child"). The evidence in the record shows that, in 2020, the father engaged in a nonexclusive sexual relationship with M.R. ("the mother"). At the time, both the mother and the father were methamphetamine addicts. After the mother became pregnant, she informed the father that he or another man could be the father of her unborn child. On April 29, 2021, the mother gave birth to the child out of wedlock; the child was born with methamphetamine in his system. Believing that the child physically resembled the father, the mother informed the father that he was the biological father of the child, but the father had heard rumors that the mother had identified other men as the father of the child, so he did not accept his paternity. Nevertheless, a few days after the child was born, the father met the child and purchased formula for the child, with the knowledge that the child may be his son. The father did not forge any relationship with the child, however. In June 2021, the father went to jail for a drug-related offense; on December 9, 2021, he went to prison; on July 14, 2022, he was released from prison into a drug-rehabilitation

30

facility; and, in December 2023, he was released from the drug-rehabilitation facility.

In June 2021, while the father was in jail, the mother agreed to a safety plan for the child with the Coffee County Department of Human Resources ("DHR") pursuant to which the child was placed with C.D. and A.D. ("the custodians"), who were already exercising custody of the mother's two older children by another man. DHR subsequently commenced in the juvenile court a dependency action regarding the child. On October 4, 2021, the juvenile court entered a final judgment ("the dependency judgment"), finding the child to be dependent and awarding permanent custody of the child to the custodians. The father was not served with notice of the dependency proceedings or the dependency judgment; the dependency judgment indicated that the father of the child was unknown at the time and that no man had come forward to be adjudicated as the father of the child. However, while in jail, the father learned from C.F., his mother and the child's paternal grandmother, who was a social worker who often worked with DHR, that the mother had lost custody of the child. After learning of the circumstances of the child,

the father did not take any action to intervene in the dependency proceedings.

Following the dependency proceedings, the mother sent the father photographs of the child and steadfastly insisted that the father was the biological father of the child. The mother also asked C.F. to send her photographs of the father as an infant so that she could compare the father's and the child's features. C.F. sent the mother the requested photographs to assist the mother in identifying the biological link between the father and the child. The father testified that, after viewing the photographs, he had been excited about the prospect of his fatherhood of the child, but, he said, because he knew that he was going to prison and then to rehabilitation, he had not taken any action toward establishing his paternity of or a relationship with the child.

In approximately June 2023, while he was still in the drug-rehabilitation facility, the father reached out to the custodians about the child, but, according to the father, they blocked his inquiries. The father did not take any additional action at that time to press his custodial rights. In January 2024, approximately six weeks after the father completed his drug-rehabilitation program, the father finally retained an

attorney regarding the matter. On February 15, 2024, the father filed a "Petition to Determine Paternity and Custody" in the juvenile court. On June 7, 2024, the juvenile court, based on genetic testing establishing the father's paternity of the child, adjudicated the father to be the biological and legal father of the child. The juvenile court proceeded to trial on the father's claims for paternity and/or visitation with the child, treating those claims as a petition to modify the October 4, 2021, judgment. Ultimately, on January 5, 2025, the juvenile court entered a final judgment maintaining custody of the child with the custodians but awarding the father visitation with the child.

The juvenile court held that the action was a child-custody-modification action governed by the standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), requiring the father to prove that a change of custody from the custodians would materially promote the best interests of the child such that the positive benefit to the child would overcome the inherently disruptive effect of the change. The juvenile court rejected the father's argument that he was entitled to the parental presumption. In the final judgment, the juvenile court explained its reasoning:

33

"In this instant matter there is a clear prior decree, the order in [the dependency proceedings] dated October 4, 2021. Although at the time of that order the father of the child was unknown and [the father] was not noticed of that proceeding, this Court is satisfied that the [father] had more than enough notice, information, and belief that he was the biological father of the child and failed to avail himself of the rights of a father and that through his own actions voluntarily forfeited any right to custody of the child. The father admitted that he has had a long history of substance abuse/misuse [and t]hat around the time of the pregnancy and birth of the child ... he and the child's mother engaged in the use of illegal controlled substances. It should be noted that the child was born positive for methamphetamine[], the drug of choice for the mother and [the] father. The child was born on April 29, 2021, and in June 2021 the father was arrested and incarcerated for the offense of possession or receipt of a controlled substance while he was on probation for the same type of offense. The father remained continuously incarcerated from June 2021 until he was sentenced to prison in December 2021. The father remained imprisoned until his release in July 2022 when he was sent to a substance abuse rehabilitation program for eighteen (18) months and was subsequently discharged from that program in December 2023. On February 15, 2024, the child's father filed this petition. For the majority of the child's life from birth until the filing of this petition the father was either in jail, prison, or rehab, abandoning this child to the care of others. This Court is convinced that the father had more than enough notice and information that he was the father of the child, or at a minimum enough information to act on that belief over the course of the past three years prior to the filing of this petition in February 2024. During that entire three-year period of time the child has resided exclusively in the home of the [custodians]. It was ... the father's voluntary choice to engage in the use of illegal controlled substances to the point that it led to his incarceration and imprisonment to his own detriment, but all the while abandoning the needs of this child to the care of the [custodians]. It is noteworthy that the father

34

seems to have addressed his substance abuse past by remaining sober at present; however, the Court is convinced that the child's father knew of the existence of the child at the time he was making these decisions and voluntarily forfeited any right to the custody of the child by engaging in these illicit behaviors. As previously mentioned, the father knew that the mother was pregnant, that they had been engaged in a sexual relationship, [that] pictures of the child [reflected that the child] looked like him as a baby, he met and saw the baby when he was a couple of days old, and he provided financial support for the benefit of the child, all prior to his incarceration and imprisonment. [The paternal grandmother] has made a career of working with families and possessed the inherent knowledge that comes with her profession to advise her son, and [the father] had the resources available to him to avail himself of any parental authority over the child; however, he failed to do so by his own volition. [The father] did not want to be a father to this child when this child was born and did not want to be a father to this child for the first three years of the child's life. Only now that he represents that he has 'changed' and 'cleaned himself up' does he want to assume the role of a parent. All the while every need this child has had from the time he was placed in the home of [the custodians] have been met by [the custodians]. The child refers to [the custodians] as 'daddy' and 'momma' and [the custodians] are the only mother and father this child has ever known. The child is now three years old and has resided his entire life in the home of [the custodians] along with his two half-sibling sisters. Such a significant emotional tie exists given the length of time the child has been in the home of [the custodians] and severing that tie would not serve the best interests of the child. The [custodians'] home is fit and acceptable and they have all they need to properly care for the child and meet all of the child's needs."

In my opinion, the juvenile court correctly decided the case under

the law as espoused in Daniels, supra, and a legion of other cases. The

juvenile court reconciled conflicting evidence regarding the father's knowledge of his paternity, and, based upon its firsthand observations, it determined that the father knew or should have known that he was the biological father of the child soon after the child was born. The juvenile court assessed the father's conduct toward the child from that point and concluded that the father had not acted as a concerned parent toward the child for the first three years of his life. The juvenile court determined that the father had thereby voluntarily forfeited his presumptive right to custody, and it assessed the case to determine whether the best interests of the child would be materially promoted by a change of custody to the father. The father does not contest the ultimate determination denying his custody claim; he appeals the judgment by asserting only that the juvenile court should have applied the parental presumption. The judgment would be affirmed if Daniels remained in place.

I agree, however, with the main opinion that the judgment violates the law as set forth in Ex parte D.J. and Ex parte G.C. Under Ex parte D.J., as misinterpreted by Ex parte G.C., when deciding whether the father had voluntarily forfeited his custody rights, the juvenile court could not consider the conduct of the father before June 7, 2024, when it

adjudicated the paternity of the child. The juvenile court was required to close its eyes to the abandonment of the child by the father before June 7, 2024, and to pretend that the father was an active parent entitled to the parental presumption. However, the juvenile court did not apply that standard; instead, it based its finding of voluntary forfeiture exclusively on the conduct of the father before the paternity adjudication. This case clearly reveals how the opinions in Ex parte D.J. and Ex parte G.C. lead to unjust results. Upon reexamination, our supreme court should recognize the errors in those opinions. Unless and until they are overruled, however, those cases must be followed.

Finally, I have considered whether the judgment can be affirmed on the alternative ground that a prior judgment had removed the child from the custody of the father. However, I am compelled to agree with the main opinion that, because the father had not acquired any custody rights to the child before the dependency judgment was entered on October 4, 2021, at least according to Ex parte D.J., 645 So. 2d at 308, that judgment did not remove the child from the custody of the father. I note that the supreme court has held that, "[a]fter a juvenile court has placed a dependent child into the custody of a proper caregiver,

37

consideration of a change of custody is conducted pursuant to the standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984). See Ex parte J.P., 641 So. 2d 276, 278 (Ala. 1994)." Ex parte S.L.M., 171 So. 3d 673, 677 (Ala. 2014). See also Ex parte D.B., 255 So. 3d 755, 756 (Ala. 2017) ("[I]t is undisputed that, in order to succeed in her request to modify custody [of a final custodial judgment in a dependency proceeding], the mother was required to meet the well settled custody-modification standard set forth in Ex parte McLendon ...."). The McLendon standard does not include the parental presumption. See Gallant v. Gallant, 184 So. 3d 387 (Ala. Civ. App. 2014). However, I have been unable to locate any case in which a parent who was not a party to a dependency judgment involving his or her child was required to meet the McLendon standard when seeking custody of his or her child, and the holding in Ex parte D.J. suggests otherwise. Therefore, I agree with the main opinion that the juvenile court erred insofar as it concluded that the father was not entitled to the parental presumption based on the entry of the dependency judgment.

Edwards, Hanson, Fridy, and Bowden, JJ., concur.